UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

CIVIL ACTION NO. 6:07-CV-364-KKC

THOMAS FISHER, and
ELIZABETH FISHER,                                                                      PLAINTIFFS,

v.                                          **OPINION AND ORDER**

ELMO GREER AND SONS, LLC,                                                   DEFENDANT.

*******************

This matter is before the Court on the Motion for Summary Judgment filed by the

Defendant Elmo Greer and Sons, LLC ("Elmo Greer") (DE 43).   For the following reasons, the

Court will grant the motion.

**I.      FACTS.**

The issue before the Court on this motion for summary judgment is whether the highway

contractor working at the construction site where a vehicle accident occurred can be held liable

for negligence because, after prior wrecks at the site, it failed to suggest or undertake changes to

the Traffic Control Plan developed for the project by the Commonwealth of Kentucky

Transportation Cabinet.

**A.      The Accident.**

The material facts in this matter are not disputed.  On October 18, 2006, the Plaintiffs,

who are husband and wife, were riding in a minivan driven by their son, Brad.  Their vehicle

approached a traffic backup at a highway construction project and Brad stopped the van at the

end of the backup.  Heather Norton, who was driving another vehicle, ran into the back of the

Case: 6:07-cv-00364-KKC   Doc #: 62   Filed: 09/24/09   Page: 2 of 19 - Page ID#: 1639

Plaintffs' van, causing the van to strike the vehicle in front of it.  There is no dispute that the Plaintiffs suffered severe personal injuries as a result of the collision.

The Plaintiffs assert that the accident was caused by the negligence of the contractor who was working on the highway repair project, the Defendant Elmo Greer.  The Plaintiffs assert that Elmo Greer failed to give motorists like Norton adequate notice of the potential for backed up traffic leading up to the construction zone.

**B.     Elmo Greer's State Contract and the Traffic Control Plan.**

Elmo Greer was working on the highway construction project pursuant to a contract with the Commonwealth of Kentucky Transportation Cabinet (the "Cabinet"). Elmo Greer agreed to perform highway resurfacing and bridge repair work on the section of I-75 north and south between mile markers 29 and 34.

The contract between Elmo Greer and the state included a detailed Traffic Control Plan ("TCP"). (DE 43, Ex. A, Pt. 2 at 7).  Elmo Greer did not take part in drafting the TCP. (DE 54, Ex. 2, Hoffman Dep. at 81). The TCP is drafted either by Cabinet personnel or by a consultant. If it is drafted by Cabinet personnel, it is generally drafted by an engineer.  (DE 54, Hoffman Dep. at 43, 80).

The TCP directs the contractor to "maintain and control traffic in accordance with the 2004 Standard Specifications and the Standard Drawings, current editions."  (DE 43, Ex. A, Pt. 2 at 7).  The 2004 Standard Specifications direct the contractor to "[m]aintain, control and protect vehicular and pedestrian traffic adjacent to and within the construction area." (DE  43, Ex. B, § 112.01).[1] The specifications provide that the contractor must "[m]aintain the portion of the

_____

[1] *See also* transportation/ky.gov/constructions/specs/2004/2004-Division100.pdf).

project used by public traffic, and adequately accommodate through and local traffic."  (DE  43, Ex. B, § 112.03.01).

The specifications further directs the contractor to "[f]urnish, erect, and maintain all traffic control devices, including signs, signals, channelization devices, temporary pavement markings, pilot cars and other items necessary to maintain traffic according to the Standard Drawings, MUTCD, plans, TCP and the ATSSA 'Quality Standard for Work Zone Traffic Control Devices' manual throughout the duration of the project." (DE 43, Mem. Ex. B, § 112.03.01). The specifications further provide:

> The Department will specify in the Contract either to close all or a portion of the section of highway under construction to through traffic, or to maintain traffic through the project.  The Department will outline specific requirements to properly maintain and control traffic in a Traffic Control Plan (TCP). The TCP will include the traffic control scheme and phasing.  The Department will consider a deviation from the TCP. Submit the proposed changes in the TCP to the Engineer in writing.  If the Department approves the alternate TCP, the Engineer will remit approval to the Contractor, in writing.

(DE 43, Mem. Ex. B, § 112.03.01).

The specifications further direct the contractor to "[n]otify the Engineer before erecting traffic control devices, changing the location of devices in place, or beginning a traffic operation of any kind, except in case of an emergency." (DE 43, Mem. Ex. B, § 112.03.01).  They further direct the contractor to "not begin work until the Engineer has approved all signing."  (DE 43, Mem. Ex. B, § 112.03.01(G)).

The MUTCD which is referenced in the Standard Specifications is the Manual on Uniform Traffic Control Devices which is approved by the Federal Highway Administrator

3

(FHWA).  The  MUTCD is "the national standard for all traffic control devices installed on any

street, highway, or bicycle trail open to public travel."  *See* mutcd.fhwa.dot.gov. at I-1.

 It provides that "[t]he responsibility for the design, placement, operation, maintenance,

and uniformity of traffic control devices shall rest with the public agency or the official having

jurisdiction." MUTCD, § 1A.07.

It further provides:

> Traffic control devices, advertisements, announcements, and other
> signs or messages within the highway right-of-way shall be placed
> only as authorized by a public authority or the official having
> jurisdiction, for the purpose of regulating, warning, or guiding
> traffic. When the public agency or the official having jurisdiction
> over a street or highway has granted proper authority, others such
> as contractors and public utility companies shall be permitted to
> install temporary traffic control devices in temporary traffic
> control zones. Such traffic control devices shall conform with the
> Standards of this Manual.

MUTCD, § 1A.08.

The TCP specifically addresses signage at the construction zone, providing the following:

> The Engineer may require additional traffic control signs in
> addition to normal lane closure signing detailed in the Standard
> Drawings. Additional signs needed may include, but are not
> limited to, dual mounted LEFT/RIGHT LANE CLOSED 1 MILE,
> LEFT/RIGHT LANE CLOSED 2 MILE, LEFT/RIGHT LANE
> CLOSED 3 MILE, SLOWED/STOPPED TRAFFIC AHEAD,
> KEEP RIGHT, KEEP LEFT, etc.

(DE 43, Ex. A, Pt. 2 at 10).

The TCP also directs Elmo Greer to:

> Provide a minimum of two Variable Message Signs for each
> direction of travel in advance of or on the project at locations
> designated by the Engineer. The Engineer will designate the
> messages to be provided.  The locations and messages designated
> may vary as the work progresses. The Variable Message Signs
> shall be in operation at all times.

4

(DE 43, Ex. A, Pt. 2 at 11).

Elmo Greer asserts that the term "Engineer" in the TCP refers to the Cabinet Engineer and that the Cabinet Engineer on the project was Daniel Hoffman.  (DE 43, Mem. at 6).  The Plaintiffs do not dispute that assertion. Elmo Greer asserts that Hoffman directed it to place the Variable Message Signs warning of a right lane closure at a location four miles before the closure and another one at six miles before the closure.  (DE 43, Mem. at 6).  A Variable Message Sign or a Changeable Message Sign (CMS) is a "sign that is capable of displaying more than one message, changeable manually, by remote control, or by automatic control."  MUTCD § 1A.13.

The TCP directs Elmo Greer to:

> Designate an employee to be traffic coordinator. During any period when a lane closure is in place, the Traffic Coordinator shall arrange for personnel to be present on the project at all times to inspect the traffic control (at least once every two hours during active operations and at any time when a lane closure is in effect) and to maintain the signing and devices. . . .

(DE 43, Ex. A, Pt. 2 at 12).

On this project, Elmo Greer's Traffic Coordinator was Wes Evans.  (DE 54, Hoffman Dep. at 109).  The Standard Specifications directs the contractor to "[e]nsure that the traffic coordinator inspects the project traffic control scheme daily" and to "[r]eport all incidents within the work zone to the Engineer."  (DE 43, Ex. B, § 112.03.01).

**C.     Signage at the Time of the Wreck.**

Before arriving at the site of the accident, Norton passed a sequence of signs advising drivers they were approaching a construction zone and/or lane closure. (DE 54, Hoffman Dep. at 177-83).

The first such sign was a trailer-mounted CMS that announced that the right lane was closed six miles ahead.  The second sign was a trailer-mounted CMS that announced that the right lane was closed four miles head.  The third sign announced road work three miles ahead and was placed on both sides of the south-bound highway.  The fourth and fifth sign announced road work two miles and one mile ahead, respectively and were also placed on both sides of the south-bound highway. The final sign announced "Reduce Speed Ahead" and was placed on both sides of the south-bound highway.

There is no dispute that the signage used on the project exceeded what was required under the Standard Drawings and the MUTCD.  (DE 54, Hoffman Dep. at 133-34).

Elmo Greer kept an extra CMS on site in addition to the two specified in the contract. (DE 52, Ex. 7, W. Evans Dep. at 73-78).  Wes Evans testified in his deposition that he would use the extra sign to in the event of traffic backups to warn of stopped traffic. (DE 52, Evans Dep. at 73-78).  Traffic backups are common when one lane is closed on I-75.  (DE 54, Hoffman Dep. at 176-77).   Wes Evans testified that he used the extra sign once but he did not use it on the night of the Plaintiffs' wreck. (DE 52, Evans Dep. at 73-78).  He testified that he had the authority to put the sign where he deemed necessary.  (DE 52, Evans Dep. at 78).

**D.    Prior Accidents at the Site.**

There were three rear-end accidents that occurred on I-75 South in the three months before the Plaintiff's accident: two occurred on August 7, 2006 and one occurred on October 11, 2006. (DE 43, Ex. D, Accident Reports).

In the first wreck on August 7, 2006, the driver rear-ended a car that was slowed or stopped and killed the driver of the car he hit. The driver who caused the accident was charged with DUI and second degree manslaughter. (DE 43, Ex. D, Accident Reports).

The second wreck that day occurred when a truck was unable to stop before hitting another truck that was stopped in the traffic backup caused by the fatality. (DE 43, Ex. D, Accident Reports; DE 54, Wilson Dep. at 28-29)

The third wreck, which occurred on October 11, 2006, was a rear-end collision in rain and at night.  A driver ran into the back of a stopped semi-tractor towing another semi-tractor cab.  The driver of the colliding vehicle and another witness said that they did not see any tail lights or brake lights on the semi that was struck.  (DE 43, Ex. D, Accident Reports).

### E.   Elmo Greer's use of Truck-Mounted CMS after Plaintiffs' Wreck.

Johnny Evans was the Paving Superintendent on the project for Elmo Greer.  (DE 54, J. Evans Dep. at 5). By letter to Hoffman dated October 20, 2006, Johnny Evans stated "[d]ue to recent accidents outside the project limits on the referenced project, Elmo Greer & Sons is proposing to use a truck-mounted message board as an additional method of traffic control.  This unit will be used outside the project limits to alert the traveling public of any slowed or stopped traffic. . . With these additional measures, we feel that traffic control will be greatly enhanced." (DE 54, J. Evans Dep. at 19; DE 52, Response, Ex. 10, Greer Correspondence).

Hoffman testified that Johnny Evans spoke with him regarding the truck-mounted message board probably a couple of days before the date of the letter.  (DE 54, Hoffman Dep. at 66).  Hoffman testified that adding such a message board would have required a change in the contract with Elmo Greer and would have had to be in writing.  (DE 54, Hoffman Dep. at 148-49).

The Cabinet approved the request. (DE 54, Hoffman Dep. at 203-04). The truck remained about 3/4 to 1/2 mile  before the traffic stop and was able to move with the traffic backup. (DE 54, Hoffman Dep. at 113-14).

F.      "Partnering" Requirements under the Contract.

Section 114 of the Standard Specifications addresses an item called the "Partnering Process." (DE 52, Ex. 13). Section 114.01 states that the intent of the Department is that all projects be partnered in some manner "whether it be Formal or Informal Partnering." It states that "[c]ommon objectives will be structured to meet each project's needs, but will include such basic criteria as effective and efficient contract performance, safety, and contract completion on schedule and within budget." Formal partnering included such obligations as developing plans for a Team Building Workshop and scheduling on-site project partnering meetings "at regular intervals to discuss and resolve issues regarding the project throughout the duration of the contract." (DE 52, Ex. 13, § 114.02).

The specifications provide that when "Formal Partnering is not designated in the Contract, informal partnering will be encouraged." (DE 52, Ex. 13, § 114.03). Also encouraged when Formal Partnering is not designated is "[s]cheduling on-site project meetings at a regular or on an 'as-needed' basis...to discuss and resolve issues regarding the project throughout the duration of the Contract." (DE 52, Ex. 13, § 114.03). Neither party has pointed to any provision of the contract at issue in this case that required Formal Partnering. Hoffman testified that the contract did not require Formal Partnering. (DE 54, Hoffman Dep. at 159).

As to communications between the Cabinet personnel and Elmo Greer, Hoffman testified that "I'm out there plenty enough to where they can get ahold of me and I can get ahold of them, and we talk about it right there if there's a problem." (DE 54, Hoffman Dep. at 160). Hoffman testified that he believed the state and Elmo Greer met the goals of the informal partnering provision of the contract. (DE 54, Hoffman Dep. at 161-62).

8

Hoffman also testified that Cabinet inspectors completed daily work reports the purpose of which was to document the daily work activities at the site.  (DE 54, Hoffman Dep. at 14-15). The daily work reports included an item called "Traffic Control" which was completed by the inspector each day.  (DE 54, Hoffman Dep. at 21-23).  In that item, the inspector would note such things as any traffic control deficiencies at the site.  (DE 54, Hoffman Dep. at 21-23). Hoffman testified that both the Cabinet and the contractor could make recommendations regarding traffic control and that he was "open to suggestions."  (DE 54, Hoffman Dep. at 25).

Hoffman also testified that, anytime there is a lane closure on I-75, then he expected there to be backups and delays so that he would not expect the traffic coordinator to report those events to him.  (DE 54, Hoffman Dep. at 176-77).

## II.     ANALYSIS.

### A.     Standard on Summary Judgment.

Under Fed. R. Civ. P. 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 322-25.  Once the

movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must view the facts and draw all inferences therefrom in a light most favorable to the nonmoving party.  *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).  The moving party must show conclusively that there is no genuine issue of material fact. *Id.* However, at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).  The Court is not to judge the evidence or make findings of fact.  *60 Ivy Street Corp.*, 822 F.2d at 1435-36. Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

"The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). "The nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris,* 260 F.3d 654, 665 (6th Cir. 2001).

**B.   Elmo Greer Cannot be Liable if it Complied with its Contractual Obligations.**

Elmo Greer argues that Kentucky law holds that a contractor who uses reasonable care when performing work for the Commonwealth is entitled to sovereign immunity. For this argument, Elmo Greer cites to *Hunt-Forbes Const. Co. v. Robinson*, 12 S.W.2d 303 (Ky. 1928). In that case, the defendant was a company that constructed highways in Kentucky. *Id*. at 303. The state contracted with the defendant to construct a highway that would cross through the plaintiff's land pursuant to a state right of way. *Id*. at 303. A few months after construction was complete, the plaintiff's front porch fell over and later the house turned over on its side. *Id*. at 304.

The defendant argued it could not be responsible because it "constructed the road under the directions of the state" and, thus, if it did nothing unauthorized under the state contract, it was entitled to the same immunity as the state. *Id*. The Kentucky Supreme Court noted the general rule that, if a state contractor's performance of a state contract is done "without negligence and within the terms of the contract," then it cannot be liable for damages. *Id*. The court further specifically noted that this general rule would not prevent the state contractor from being liable where the plaintiff's injury was caused by the contractor's negligence. *Id.*

In *Hunt-Forbes*, the plaintiff argued that the contractor should have built a retaining wall after removing the natural lateral support to the land.  *Id*. at 305.  However, the court noted that the contractor's contract with the state did not require the contractor to build a retaining wall.  *Id*. Thus, if there was any negligence, it was not on the part of the contractor.  *Id*.

In *Taylor v. Westerfield*, 26 S.W.2d 557 (Ky. 1930), which was decided after *Hunt-Forbes*, Kentucky's highest court specifically overturned prior Kentucky case law holding that "an independent contractor is not liable in damages to injured third parties for his *negligence* in prosecuting work being carried on under a contract with the state."  *Id*. at 561 (emphasis added). The court distinguished *Hunt-Forbes* noting that, in that case, the contractor was exempt from liability "because he had done the work in strict compliance with certain plans and specifications given to him by the state highway department."  *Id*. at 560.   The court stated, "[i]t is one thing to say that the contractor shall not be responsible where he does the work in strict compliance with the plans and specifications and an entirely different thing to say that he must be responsible if he negligently does the work."

Later still, in *City of Louisville v. Padgett*, 457 S.W.2d 485 (Ky. 1970), the Kentucky Supreme Court confirmed that:

> Ordinarily one contracting with the sovereign Commonwealth of Kentucky who performs his contract in conformity with the plans and specifications of the contract will not be held liable for injury to the public in the absence of a negligent. . . or a willful tortious act or [unless] he is engaged in an ultra-hazardous activities such as blasting, which is treated as trespass.

*Id*. at 488 (citations omitted).

Thus, in that case, the court determined it must start from the premise that the state contractor was not liable for negligence if it performed the contract in strict conformity with the state's specifications. *Id*.

As to the policy behind the general rule, the court noted:

> If the contractor was required, at its peril, to check and double check all plans given it and required to keep an engineering force for th purpose of interpreting these plans, and was not permitted to follow the orders of the engineering force of its superior, then the costs of public improvement would be so increased as to make them almost prohibitive. The purpose of having the State Engineering Department for these public improvements is to lay out these projects and to tell the contractor where to do its work. The contractor's work is not the engineering job of laying out the project but is merely in doing what it is instructed to do. So long as it does this work as it is instructed to do by its superior in a workman like manner, not negligently, then the contractor is not liable.

*Id*. at 489-90 (quoting *Wood v. Foster & Creighton Co.*, 235 S.W.2d 1, 3 (1950)).

### C.    Elmo Greer Had no Contractual Duty to Implement or Suggest Additional Signage at the Accident Site.

In their response, the Plaintiffs do not dispute that Elmo Greer cannot be held liable if it performed its contractual obligations with reasonable care. The Plaintiffs contend, however, that Elmo Greer failed to perform some of its contractual obligations.  (DE 52, Response at 7).

In their response brief, the Plaintiffs argue that Elmo Greer failed to fulfill two obligations set forth in the Standard Specifications.  The first is the duty to "maintain, control and protect vehicular and pedestrian traffic adjacent to and within the construction area," (DE 43, Ex. B § 112.01) and the second is a duty to "maintain the portion of the project used by public traffic, and adequately accommodate through and local traffic."  (DE 43, Ex. B § 112.03.01).

13

The Plaintiffs argue that Elmo Greer failed to fulfill these contractual obligations when it "failed to respond [to accidents occurring within the construction zone] by implementing realtime warning devices or by making a timely recommendation to the Cabinet that such warning devices be added."  (DE 52, Response at 7).  At the hearing on this matter, the Plaintiffs explained that their position is that a CMS should have been placed in relatively close proximity to the backed-up traffic to advise Norton and other drivers of the known hazards of stopped traffic on the interstate.  The Plaintiffs argued that Elmo Greer should have either placed the CMS itself or suggested that the Cabinet amend the TCP to include the CMS.

In support of the argument that such a duty existed, the Plaintiffs cite the testimony of Elmo Greer's retained expert, Dr. Joseph Blaschke, who testified that the contractor is "certainly at liberty" to suggest other traffic control signs at a site. (DE 52, Ex. 22 Blaschke Dep. at 100-02).  While this may be evidence that Elmo Greer was permitted to suggest other traffic control signs at the site, this testimony is not evidence that Elmo Greer had a duty to do so under the contract.

The Plaintiffs also cite the fact that Wes Evans maintained an extra CMS on site in addition to the two specified in the contract that he testified he would use to warn of stopped traffic.  However, the fact that Elmo Greer could and did use extra signs on the site to warn of traffic backups does not create a contractual duty to do so.

The Plaintiffs cite Cabinet Engineer Hoffman's deposition testimony that he was "open to suggestions" from contractors regarding changes to the TCP.  (DE 54, Hoffman Dep. at 24-25).  However, the fact that the Cabinet Engineer was willing to listen to suggested changes from the contractor, does not mean the contractor was contractually obligated to make such suggestions.

The Plaintiffs have cited no provision of the contract requiring Elmo Greer to implement additional signs at the construction site beyond those required by the state or requiring Elmo Greer to suggest changes to the TCP. The fact that the Plaintiffs are unable to point to a contractual obligation that Elmo Greer failed to fulfill distinguishes this case from *Gilbert v. Murray Paving Co., Inc.*, 147 S.W.3d 736 (Ky. 2004).

In that case, the Defendant Murray Paving entered into a contract with the Kentucky Department of Highways requiring it to resurface portions of two highways. *Id.* at 737. The Kentucky Court of Appeals noted that, "[t]he Department established the standards for Murray Paving's work, designed and laid out the work, and provided the project engineer, state inspector and final inspector." *Id.* at 737-38. Further, as in this case, a state inspector was at the work site each day. *Id.* at 738.

The plaintiff lost control of his tractor-trailer at the construction site when he steered it to the right of the road onto the highway's rumble strip in order to avoid a pickup truck that was weaving into the right lane. *Id.* at 739. The plaintiff alleged that he lost control because the tractor-trailer dropped off the shoulder. *Id.* He asserted a claim against Murray Paving arguing that it negligently performed the resurfacing work and failed to warn him of the dangerous conditions. *Id.*

The trial court dismissed the plaintiff's claim on the basis that Murray Paving performed the work as specified by the state and was accepted by the state. *Id.* The Court of Appeals reversed, finding that there were genuine issues of material fact regarding whether Murray Paving performed its contractual obligations in a negligent manner. *Id.* at 741.

In reaching this decision, the court noted that the contract called for the pavement shoulder to have a drop-off height of one inch from the pavement to the unpaved earth "where

existing conditions permit." *Id*. However, it was undisputed that, at the point where the Plaintiff's tractor-trailer left the roadway, the drop-off may have been as high as five and one-half inches. *Id*. The court further noted that Murray Paving's foreman testified that he believed he could have reduced the drop-off height at the accident site. *Id*. Further, the plaintiff's retained expert testified that Murray Paving could and should have reduced the drop-off height at the site. *Id*. The court determined that this evidence precluded a summary judgment.

As to the plaintiff's claim that Murray Paving negligently failed to warn of the dangerous conditions, the Court of Appeals noted that the traffic control plan at issue called for warning devices where drop-off heights were between two and four inches "where traffic was not expected to cross, except accidentally." *Id.*. at 742. The court noted that there was evidence that the pavement shoulder where the plaintiff left the road was of such a height that warning devices should have been implemented. *Id.*

Thus, in *Murray Paving*, the contractor had the contractual duty to ensure the pavement shoulder had a one-inch drop-off height "where existing conditions permit" and to implement warning devices for drop-off heights of two to four inches. Further, there was evidence that the defendant failed to comply with these duties.

In this case, as discussed, the Plaintiffs have pointed to two contractual duties of Elmo Greer: to maintain, control, and protect vehicular traffic within the construction zone and to adequately accommodate through and local traffic. The Plaintiffs allege that Elmo Greer breached these contractual duties by failing to "alert motorists of the dangerous traffic backups" (DE 52, Response at 12) or by failing to suggest different alerts than required by the state.

Elmo Greer's duties with regard to alerting motorists to dangerous traffic backups, however, was specifically addressed in the TCP. The specific provisions of the TCP control any

general provisions in the contract that may also be construed to address Elmo Greer's obligations with regard to traffic control and signage at the site. *See, e.g., State Auto. Mut. Ins. Co. v. Ellis*, 700 S.W.2d 801, 803 (Ky. App. 1985). And there is no dispute that Elmo Greer complied with all of its obligations in the TCP, including the placement of traffic control signs.

The Plaintiffs' real complaint seems to be that the state did not require a truck-mounted CMS. As in *Hunt-Forbes*, however, if there was any negligence in the fact that the state did not require a truck-mounted CMS, it was not on the part of the contractor.

The Plaintiffs argue that, even if Greer had no duty to make changes to the TCP, it "assumed such a duty by exercising its judgment and discretion." The Court assumes that the Plaintiffs are referring to Johnny Evans' request to implement a truck-mounted CMS at the site. The Plaintiffs argue that, under Kentucky law, an individual can be liable for negligently performing a task voluntarily assumed.

Even if Elmo Greer could be held liable for any damages caused by its implementation of any truck-mounted CMS, Elmo Greer did not implement the truck-mounted CMS until after the Plaintiffs' wreck. Thus, the truck-mounted CMS could not have caused the Plaintiffs' wreck. More importantly, the Plaintiffs do not assert that their injuries were caused by the manner in which Elmo Greer implemented the truck-mounted CMS, but rather by Elmo Greer's failure to implement the additional sign at all. In order for Elmo Greer to be held liable for such an omission, the Court must find that it had a contractual duty to place the truck-mounted CMS at the construction site or, at least, the duty to request that the Cabinet do so.

The Plaintiffs have pointed to no provision of the contract that imposes such obligations on Elmo Greer. Moreover, it would make no sense for the contract to impose such obligations since Cabinet personnel were at the site each day and, thus, were as aware as Murray Paving of

the traffic conditions at the site, including prior wrecks.  Further, the Cabinet personnel had the engineering expertise needed to develop a traffic control plan.

Thus, the specifications make clear that the state will "outline specific requirements to properly maintain and control traffic in a Traffic Control Plan (TCP)."  The specifications and the MUTCD further make clear that Elmo Greer is not to deviate from the TCP.  There is no dispute that Elmo Greer complied with the traffic control requirements of the contract, including the TCP.  Accordingly, it cannot be liable for any injuries caused by inadequate signage near the accident site.

### D.   Elmo Greer Could Not have breached the "Partnering" Provisions of the Standard Specifications.

Finally, in their response brief to the Motion for Summary Judgment, the Plaintiffs argue that Elmo Greer also breached the "partnering" provisions found at Section 114 of the Standard Specifications.  As discussed, this Section contains provisions regarding "Formal Partnering" and "Informal Partnering."  The Plaintiffs argue in their response brief that Elmo Greer failed to "[s]chedule on-site project partnering meetings at regular intervals to discuss and resolve issues regarding the project" as set forth under the "Formal Partnering" provision of the Standard Specifications. (DE 52, Ex. 13, § 114.02). The Plaintiffs argue that, had such meetings been conducted, then Elmo Greer would have requested before the Plaintiffs' wreck that a truck-mounted CMS be used at the site and that the use of the truck-mounted CMS would have prevented the Plaintiffs' injuries.

While this is a brief argument in the Plaintiff's response brief, at the hearing on this matter, the Plaintiffs indicated that this may be the only provision of the contract that they claim Elmo Greer breached.

The problem with this argument, however, is that the Formal Partnering provisions apply only if the contract specifically makes that designation. (DE 52, Ex. 13, § 114.03). There is no dispute here that the state contract with Elmo Greer did not designate Formal Partnering. Accordingly, the "Informal Partnering" provision applies. (DE 52, Ex. 13, § 114.03). That provision states "[s]cheduling on-site project meetings at a regular on a 'as-needed' basis is *encouraged* to discuss and resolve issues regarding the project throughout the duration of the Contract." (emphasis added). Because regular or as-needed meetings are only encouraged and not mandated, there could be no evidence from which a jury could conclude that Elmo Greer breached this provision.

Further, the only evidence in the record is that Cabinet personnel and Elmo Greer personnel regularly communicated as encouraged under the Informal Partnering provision. Cabinet inspectors were on site each day and Cabinet Engineer Hoffman testified that he was at the site "plenty enough" to permit regular communications. Thus, even if the Informal Partnering provision imposed a duty on Elmo Greer to conduct regular or as-needed meetings with Cabinet personnel, then there is no evidence that Elmo Greer failed to comply with this provision.

## III.     CONCLUSION.

For all these reasons, the Court hereby ORDERS that the Defendant's Motion for Summary Judgment (DE 43) is GRANTED.

Dated this 24th day of September, 2009.



**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**